Larry **WOLF**, Appellant,

v.

**PERSONNEL ADVISORY BOARD of the State of Missouri, Harold E. Cox, Thomas C. McKelly and Lynn Twitty, its members; Fred McDaniel, Director, Missouri Division of Youth Services; James F. Walsh, Director, Department of Social Services; Richard J. Bell, III, Superintendent, Training School for Boys, Respondents.**

No. WD 30815.

Missouri Court of Appeals, Western District.

June 9, 1980.

Dale C. Doerhoff, Jefferson City, for appellant; Cook, Vetter & Doerhoff, Jefferson City, of counsel.

John Ashcroft, Atty. Gen., Robert L. Presson, Asst. Atty. Gen., Jefferson City, for respondents.

Before KENNEDY, P. J., and PRITCHARD and SWOFFORD, JJ.

PRITCHARD, Judge.

Richard J. Bell, III, Superintendent of the Missouri Training School for Boys, Boonville, Missouri, on March 11, 1977, personally served a copy of a letter of discharge upon appellant, discharging him from his previous position as Youth Specialist I at the training school, effective March 14, 1977. An appeal was filed by appellant before the Personnel Advisory Board on April 12, 1977, and a hearing was had on June 24, 1977, before that board with an administrative hearing officer presiding. The board sustained the discharge but upon only three of the alleged grounds: Appel-

lant's failure to report for duty on April 13, 1976; his absence from his duty station at the Communications Center on February 15, 1977; and his abuse of state property by making personal long distance telephone calls on a state telephone without reimbursement to the state.

Appellant contends by Point I that he was not discharged by the appointing authority [defined by § 36.020(1) (amended by Laws 1974, 1st Ex. Session, p. 515, § 1; Laws 1979, p. ——, H.B.No. 673, § 1) as "an officer or agency subject to this law having power to make appointments".] He says that the Board of Training Schools was formerly invested with the charge and control of all training schools under § 219.020, that board was the proper appointing authority, and he questions that the Division of Youth Services, Department of Social Services, was the appointing authority as concluded by the Personnel Advisory Board. He further says that the Personnel Advisory Board made an erroneous conclusion that Superintendent Bell was delegated the authority to discharge.

By Point II, appellant contends that a merit raise given him in August, 1976, constituted a waiver of any prior misconduct.

■ Answering Point I, respondents say that the Omnibus State Reorganization Act of 1974 changed the authority for appointment from the Board of Training Schools to the Division of Youth Services in the Department of Social Services. § 13, subd. 16, of that act, is: "All the powers, duties and functions vested in the state board of training schools, chapter 219 RSMo and others, are transferred by type I transfer to the division of youth services hereby authorized in the department of social services headed by a director appointed by the director of the department. The state board of training schools shall be reconstituted as an advisory board on youth services, appointed by the director of the department. * * *." The "type I transfer" is defined in § 1, subd. 7(1)(a): "Under this act a 'type I transfer' is the transfer to the new department or division of all the authority, powers, duties, functions, records, personnel,

property, matters pending and all other pertinent vestiges of the existing department, division, agency, board, commission, unit, or program to the director of the designated department or division for assimilation and assignment within the department or division as he shall determine, to provide maximum efficiency, economy of operation and optimum service. All rules, orders and related matter of such transferred operations shall be made under direction of the director of the new department."

Clearly, the Omnibus State Reorganization Act of 1974 changed the appointing authority of the State Board of Training Schools under the general terms of § 219.-020, RSMo 1969 (that the State Board have charge and control of all training schools), to the division of youth service in the department of social services, quoted supra, under a type I transfer. The State Board of Training Schools was thereunder reduced to a mere advisory board shorn of any preexistent powers and duties. The appointing authority of personnel such as appellant is the division of youth services, as appellant concedes.

■ As to the contention that Superintendent Bell had not been delegated the authority to discharge appellant, further facts are these: At the time of the hearing, Bell had been superintendent of the training school for about 4½ years. During that time, he had hired numerous people, and also had dismissed people. Prior to becoming superintendent of the training school, he occupied the position of superintendent of the W. E. Sears Youth Center, which was then called the Poplar Bluff Youth Center, being also an institution under the Division of Youth Services. When he was originally hired, the Poplar Bluff Center was under the State Board of Training Schools, and he was employed by Mr. Wendell Sears, then the board's director. Although Bell could not recall any specific discussion about his responsibility to hire and fire employees, in clarification he remembered "two incidents that occurred shortly after I came, where the chairman of the board and the director at that time, Mr. McDaniel, posted me

about dismissing an employee; and it was my decision not to do so, and I was advised or asked to consider doing so. There were two cases I can think of, so my assumption has been that I had the authority and I was expected to make my decisions."

At the time of hearing, Fred McDaniel was Director of the Division of Youth Services. His first position was in 1971 as Director of Management Services for 8 months. Then he was acting Director of the Board of Training Schools for 2½ years, after which he was deputy Director of the Division of Youth Services for 2½ years. During the course of his employment as Director, he had had occasion to hire superintendents and managers for various facilities within the division, at which time he explained their duties to them. With regard to their authority to hire and fire employees, McDaniel explained to them that such would be their responsibility locally. "A I explained to them that I wanted them to handle the firing and hiring of employees on a local basis or in other words on the institutional level. And since that time I have—there are four institutions, and I have hired three of the four institutional superintendents personally and was in fact the one who asked Mr. Bell to transfer from the youth center to Boonville. Q Following this advice you'd given them regarding their duties, have the decisions as to hiring and firing then been carried out by the facility managers? A Yes, they have. Q So they are the ones who have made that decision? A Yes, sir. Q How many employees are within the Division of Youth Services all tolled? Do you have any idea? A 752 authorized employees. Q And how many facilities, institutions, group homes and offices do you have around the state? A Well, there are four institutions and 15 group homes and three park camps and ten aftercare offices." Bell testified that while he was superintendent of the (Poplar Bluff) youth center he was responsible for all hiring through the proper merit system procedures, as well as any disciplinary action that might occur up to and including dismissals. When Bell became superintendent of the training school, McDan-

iel did not recall reminding him of specific duties other than to carry on as he had in the past as superintendent at the youth center. On cross-examination, McDaniel acknowledged that any discussions with other superintendents concerning their authority would have been oral. He had never issued a regulation conferring power upon them, except that in the last month or so (before hearing) he did file one regarding authority to hire and fire on request from the Personnel Division.

Exhibit G, the Division of Youth Services policy manual, was introduced into evidence. Pertinent portions thereof clearly indicate that agency's policy to have personnel matters be determined at the institutional level: The agency's goal is to help *supervisors* find, select and retain staff of the highest possible quality; The kind of people hired at any level within the Division is the primary responsibility of their immediate *supervisor*, who should have maximum flexibility in the staffing pattern of the unit; All employees should be given the opportunity to resign rather than being dismissed, unless in the opinion of their *supervisor*, they exhibit qualities which would make them unsuitable for any type of state service in the future; When dismissal of a regular employee is necessary, the reason for this action must be well documented; The *supervisor* must write a letter to the regular employee stating the reasons for dismissal and suspending him for three (preferably five) days without pay; In cases where an employee does not report for work for three consecutive days and does not notify his *supervisor* of the reasons for absence, he may be dismissed on the grounds of job abandonment, in which event the *supervisor* should again write a letter explaining all reasons for dismissal and send it by registered mail to the employee at his last known address. [Italics added.] This is a reasonable policy because of the large number of employees (752) within the division who would otherwise have to be supervised by the director who would not have the direct and close contact with employees in order to know of individual job performances.

■ There is no necessity that the delegation of authority to hire and fire employees of the State Training School be in writing, and appellant cites no authority that any delegation may not be oral. Under the evidence above set forth, there is a clear inference that Superintendent Bell was in fact delegated the authority to dismiss employees for cause. The Division of Youth Services' policies so indicate, and Bell was clearly told to carry on as superintendent of the training school as he had been at the Poplar Bluff Youth Center, where he had the authority to hire and fire. After assuming the office of superintendent at the training school, he did, in fact, hire and dismiss employees, indicating that he was exercising the authority granted him by director McDaniel. Appellant's contention in this regard is without merit, and it is overruled.

■ In his second point, appellant contends that by reason of his having received a merit increase in pay in August, 1976, respondents waived any acts of misconduct prior thereto, and the same could not be used as a basis for his dismissal. § 36.380 provides that "An appointing authority may dismiss for cause any employee in his division occupying a position subject hereto when he considers that such action is required *in the interests of efficient administration and that the good of the service will be served thereby.* * * *." [Italics added.] Under a comparable federal statute, 5 U.S.C.A. § 652(a) (1958), the case of *Seebach v. Cullen*, 338 F.2d 663 (9th Cir. 1964), it was held that examples of emotional instability and inefficiency of the employee in 1959 or other years where appellant had received a rating of satisfactory or better could be relied upon in the removal proceedings, "for such cause as will promote the efficiency of such service and for reasons given in writing." In *DeFino v. McNamara*, 287 F.2d 339 (C.A.D.C.1961), it was held that satisfactory rating received subsequent to charged acts of insubordination was not a waiver because of the interest of promoting the efficiency of the service. See also *King v. Hampton*, 412 F.Supp. 827 (E.D.Va.1976). Appellant's cited case of *Jordan v. Webber Moulding Co.*, 72 Mo.App. 325 (1897), is inapposite because that case involved a private employment contract, wherein it was held that there could be a waiver (in the jury's determination) of acts of unprovoked insolence and insubordination bringing about discharge from employment where there was evidence that the employer was willing to continue the employment if plaintiff employee would work for a less price than stipulated in the contract. See also the second appeal of this same case, 77 Mo.App. 572 (1898). There was, of course, no statute such as § 36.380 setting the public policy of dismissal of public employees for cause and in the interests of efficient administration and the good of the service.

The use by appellant of state telephones for his personal calls, without reimbursement to the state, occurred before he received the merit pay increase in August, 1976, and these calls did not come to light until September, 1976, all as found by the board, which findings are here unchallenged. Even if other acts of misconduct occurring prior to the merit increase could not be considered, there could be no waiver as to the personal telephone calls as a basis for dismissal because they came to the knowledge of the appointing authority after the merit increase was awarded.

The judgment is affirmed.

All concur.